Yes, good morning, your honors. Charles Fleischman appearing for the appellant, Mr. Salomaa. I think we start right off the bat with the fact that the two doctors that were working for Cigna that disputed my client's claim did not know anything about or had no expertise in chronic fatigue syndrome. Am I remembering the right case? I have a vague recollection that there was a Dr. Sanchez who wrote an independent medical report that was not given to the lawyer for the applicant. Am I thinking of the right case or is that another of my... I think that's another one. Thanks. Thank you very much. This is a chronic fatigue syndrome case and they had two doctors who reviewed the records. One initially said that he wasn't disabled and the second, well, they never said he wasn't disabled. They said there's not enough evidence. And neither of these two doctors, they were both employees of the insurance company, had any expertise in chronic fatigue syndrome. Indeed, they were looking for objective positive test results. They were looking for objective symptoms. They were looking for all kinds of objective evidence. And the heart of chronic fatigue syndrome is there is no objective evidence of its existence and there is no way to test objectively for it. It's tested by eliminating all other possibilities for the symptoms. Let me ask you this. I gather from the district judge's order that he takes your point on that. There is no definitive test for this. But he says, okay, you still have to prove that he's not able to function, basically. And that's where he failed in the district judge's view. What's the answer to that? The answer to that is he's got a declaration from his former supervisor saying he couldn't do the work. He's got declarations from his father, his brother-in-law, his wife talking about his condition. You've got two chronic fatigue syndrome experts. One of them is the guy that helped write the definition of the disease. Both say that he's the most, coincidentally, both say he's the most disabled chronic fatigue syndrome person they've ever seen. You've got his search for almost a year trying to find out what's wrong with him. He had no idea where he's gone through heart testing. He's gone through testosterone testing. He's gone through psychological treatments. And you've got my questioning over and over, what objective evidence of disability would satisfy you? What are you looking for? And they never bother to answer the question. There is no objective evidence of fatigue. They partially answered the question. They asked him to go through certain mental tests, which he did later on after the period had run. And there also are motor tests, none of which were ever done. They asked him to go through the psychological testing after they denied the claim. And he went through that, I think it was five or six months later. Okay. And when he went through the testing, they rejected it outright because it didn't refer back to the period before they even asked him about the testing. So there was no way their asking him to go through the testing would have provided the evidence they were looking for during the elimination period because they didn't ask him until after the elimination period. Counsel, it turns out I was thinking of the right case, but I had the wrong name. It wasn't Dr. Sanchez. It was Dr. Mendez. As I understand it, the insurance company got an evaluation from Dr. Mendez based on Dr. Mendez analyzing the file. Dr. Mendez said that the man was not disabled, in his opinion. And as I recall, there was some dispute because Saloma's lawyer requested all doctor's reports on which you rely, and the insurance company did not send Saloma's lawyer the Mendez report on which it relied. Have I got the timing right and the facts right? That's right. That was based on the case out of the Eighth Circuit that says that when you ask for the medical reports and there's time to give it to you, they have to give it to you so you can respond. When, if ever, did they give you Dr. Mendez's report? I didn't get that until after the final denial of the appeal, the administrative appeal. The final denial of the administrator's appeal. Right. So you did not have a chance to show it to Saloma's doctors and ask them what they thought of it? No opportunity at all. Did Mendez, he wasn't an examining physician, right? No, they were all paper reviewers. A file reviewer. A file reviewer. Insurance companies get independent medical exams where they have their own doctor look at the fellow, and they also have independent analyses by doctors where they just look at the file. This fellow was a file review? Yeah. Sometimes they hire outside doctors to review the file. This was an insurance. They were both insurance. Lena employed doctors who never examined him but just reviewed the records, and they had no knowledge about chronic fatigue syndrome. I sent them the Center for Disease Control definition of it. I sent them the Cigna medical page taken out of the Internet, which described chronic fatigue syndrome, and they still insisted on looking for objective evidence, and there is no objective evidence. Did they ever tell you what kind of objective evidence they wanted? As I remember, with chronic fatigue syndrome, it was much debated among physicians, and they finally settled on, I think, 14 points, and you had to, when the doctor said, does this hurt, you had to have six of the 14 points and not a whole lot of other points or something like that? That's fibromyalgia, and you have to have, I think it's 11 of the 18 points. It could be 16 of the 18 points, but there's 18 points. That's fibromyalgia. Oh, this is not fibromyalgia. This is chronic fatigue syndrome. One is pain throughout the body, and the other one is overwhelming fatigue. Incidentally, I noticed that they basically ruled out depression because antidepressants didn't work, and they ruled out low testosterone because testosterone patches didn't work, and they ruled out thyroid because I can't remember if either T4 was normal or synthroid didn't work. Did they also try for B12? I have no idea. I know they ruled out heart disease also. Chronic fatigue. Yeah. Heart failure. Yeah, they went from one. It was Kaiser, and they went from one possibility to the next and the next and the next, and after almost, I think it was close to a year, they finally came down low. It's chronic fatigue syndrome. Thank you. Thank you. Are there any other questions? You can reserve your time. Yes. Thank you. Counsel. Good morning. My name is Melissa Cowan with Burke, Waynes, and Sorensen here in downtown Los Angeles, and I represent the FLE. You're echoing a little because of the acoustics here, so try to speak clearly. Am I too close? Okay, sure. Basically, what we have here is a situation in which the Sonoma is challenging whether or not the abusive discretion standard was properly applied here. I have a couple of problems with the case. Certainly. I appreciate your help. One is it looks to me from the statute and the regs, as well as out-of-circuit authority, we haven't spoken to it yet, as though when a plaintiff asks for all the medical reports on which you rely, the insurance company has to give the plaintiff all the medical reports on which they rely, and it looks like he asked, he didn't get the Mendez report, and they relied in part on the Mendez report. Why doesn't that compel a reversal? There's no obligation in the Ninth Circuit to do that, Your Honor. The Eighth Circuit case of Abram v. Cargill is that which is cited by plaintiff or Mr. Saloma, and since then, the Metzger case, the Metzger case. Is it the law that in the Eighth Circuit they would have had to give him the Mendez report, but the Ninth has not spoken one way or the other, or has the Ninth said they don't have to give him the Mendez report? The lower courts have all said you don't have to do that because it creates a circuit. I asked you about lower courts. I asked you about the – listen to my question. Is it the case that if he were in the Eighth Circuit, the insurance company would have had to give the plaintiff the Mendez report, but the Ninth Circuit has not spoken one way or the other, or is it the case that in the Ninth Circuit we have said at the circuit level that they would not have to give him the Mendez report? I do not specifically recall a published Ninth Circuit decision as to this issue, but the Tenth and Eleventh Circuits have spoken to it and said you do not have to do this, because all of the regulations requires that an administrative decision be made, and at that point in time you can provide the claimant with your records to review. Now, in this particular instance, the documentation was provided to Mr. Fleischman, who was representing Mr. Saloma during the course of the claim during the appeal, and at the final – He says he didn't get the Mendez report until after the final decision. Are you saying that's not true? He did receive it, but during – if you read the final denial letter dated February 14th, it says if you do not like this decision, we still will be willing to consider additional information. And, in fact, he immediately filed a lawsuit rather than submit it. But you didn't answer my question. He said he didn't get the Mendez report until after the final decision. Correct. Is that true or false? True. Thanks. That is correct. Let me ask you about something else that bothered me in this case. Sure. Surveillance videos are usually pretty good. I had one with a paralyzed – a doctor who claimed a paralyzed right arm in a surveillance video that shows him opening the trunk, taking out the spare, changing the tire with the right arm. And you get some dramatic surveillance videos. This one, it looks like mostly he didn't do much. Drove his daughter's – what was it, 10 minutes to school? And went shopping one day and caught the window. Is that right? Yes, Your Honor, but at this point, the district court did not consider that videotape in the course of evaluating the merits of the case. It only went to and was only submitted with regard to the de novo evaluation. I'm not asking about admissibility right now. Okay. I'm asking about content. Was my description of the surveillance video accurate? I didn't watch it because it takes several days. That's fine. There were actually quite a bit of additional things that were demonstrated. And if the court would permit, I would explain the background. But just as to the surveillance, it demonstrated Mr. Salomo was out mowing his lawn for quite some time when he claimed – How long? I think it was at least 10 to 15 minutes. And I haven't reviewed the surveillance because it was not considered by the court. 10 or 15 minutes. Correct. He was also – his claim was that he could not handle – Because I remember the window caulking was 10 minutes. Yes. And the lawn mowing was 10 or 15 minutes? That's my recollection because he was in the front and in the back. In this instance, though, it's highly inconsistent with his claim of being bedridden, of having a difficulty with exposure to light, to sound, and that he was unsteady. His wife actually came out and was standing at the bottom of the ladder, and he was up there caulking at a two-story level, which was inconsistent with his claim of – at least he was telling the company in his claim forms precisely, any sitting or standing causes me debilitating fatigue. His doctors repeated that. He was essentially bedridden. That's why I asked you how long he did these things. Yes. That's what we were able to see. He was actually out and about. Was there anything else where we have substantial activity by him? He was demonstrated – well, he was telling the company during the claim that what he was doing is he was bedridden, as he stated in his claim forms. He was bedridden. He couldn't get out. He was – Hold on. You're not answering my question. I'm asking you for the good stuff from the surveillance video. Oh, you want just the surveillance video. That is the surveillance video. It showed him mowing his lawn. It showed him climbing his ladder multiple times, carrying items, clocking his window. It showed him going out in the morning, taking a walk, taking his children to school. How long was he physically active? What was the longest he was physically active on the surveillance video? It's difficult to determine, obviously, because it is surveillance. Probably 15-plus minutes at a time, besides the fact that he was out driving, picking up his children from a local school and returning. Now, let me ask you a different question. The insurance company wanted some objective evidence of his chronic fatigue syndrome. What objective evidence? Did they request any specific test or objective determination? From the very outset, on the April 22nd letter, they noted that there were issues as to the lack of evidence. Hold on. You didn't understand my question. I know they said right from the get-go, you don't have any objective evidence of your chronic fatigue syndrome. Now, there are some things where people can request specific objective evidence. I want you to do an MRI. I want you to do a B12 test. I want you to do a T4 test for thyroid. Objective things you can do. In this one, I know that they said from the beginning, you don't have objective evidence. What I want to know is did they ask for any particular objective test that was not done? Did they ask for any – did they designate any objective evidence that they requested? A specific test, no. But they did explain we would like to look at objective testing because it does not demonstrate that you cannot work. What would you have had them do? They did not cite any because CFS – What objective testing? There is not an objective test to evaluate CFS because that was what this condition is all about. They went out, and according to the actual documentation submitted by Mr. Saloma, they went out and evaluated all the objective tests that he had. What objective tests did they want? Well, they evaluated the MRIs that he had, all this, but those did not – Judge Karnfeld is asking you there is no test that would have – Right. Okay. Yes. They're asking him to do an impossible thing, to provide tests that would confirm this disease, right? But they're not asking for it to confirm the disease. They're asking for it to evaluate whether or not he is disabled from his occupational activity. Okay. Now, what tests would have shown that he is disabled? Specific tests, Your Honor, I don't – Name one. Neuropsychological testing contributes to this. Which he did. Which test? Which neuropsychological test? The neuropsychological test which he did, which actually did not demonstrate cognitive impairment. It showed some abnormalities. On two cases, one for grip strength, another one was a concentration or, excuse me, an attention one, where it showed he did not respond to nine tests, but he was average or better on verbal performance IQ, motor skills, memory learning, attention concentration, language, executive functioning, visual-spatial skills, all of these things. Well, he was a really smart guy. The question isn't whether he's smart or dumb. It's whether he has chronic fatigue syndrome. But these actually evaluated the cognitive elements, which he claims that he had problems with, which actually supported the findings demonstrated during the elimination period, which is a period we have to look at. Well, he was a really – I'm still looking for some test. I mean, you take really smart people. Well, you could probably lose 30 points of IQ and you'd still be smarter than the average person. So you wouldn't show as abnormal. That's – I'm looking for something that they wanted that would show. I understand the struggle. What the court, the district court did and what happens in all these cases, including the cases which are cited in the briefs and in the loan versus continental case, which actually dealt with CFS, they have to look at the totality of the circumstances. They look at the objective evidence that's out there. And here, all the objective evidence demonstrated that he had, demonstrated that he didn't have anything wrong with him. Even his own doctor did not cite those things. They didn't demonstrate that he didn't have anything wrong with him. They demonstrated that there was nothing wrong with him that was revealed by that test. It's a little different. To put it in really simple terms, you can have a broken leg and all the x-rays in the world of your arm won't show any problem. Well, he had a full cardiology workup, an endocrinology workup. A hearing specialist saw him, his internist. All of them concluded that he did not have issues which would explain this fatigue that he had. And that's how they diagnosed CFS, isn't it? Correct. Okay. So that's all consistent with his claim.  But here we have a self-reported issue. Okay. But that's true. But then you have two experts who says that his presentation is consistent with his self-report. But you go back to Maniotti and also to the Nord case. Nord says even though claimants argue that the in-house reviewers or medical reviewers might be biased because there's an incentive to find their disability, Nord says just the opposite also. You have to weigh the fact that a treating physician is going to have incentive to claim disability. I understand that, but then you didn't have him examined by any other physician. The only doctors who laid eyes on him think he's got this condition and think it's severe. Is that true? Yes, based on the self-report. Isn't that a pretty damning fact for you? That is a difficult point, but under an abusive discretion standard of review, the district court didn't commit clear error when it evaluated this. Assuming it's abusive discretion, why isn't it an abusive discretion if every doctor who sees the guy says he's got the condition and it's severe, and the only ones who say it's not so bad are the insurance company's doctors who never saw the man? We look at two things. Number one, treating physicians are advocates. Maniotti, as discussed in the briefing, discusses that fact. And your doctors are on your side, right? Yes, correctly. I have two doctors, but there's no evidence that these doctors are. Why should they have gotten an independent doctor to actually touch the man, look at him, and render an independent opinion? There's no obligation to do that. No, but then you shouldn't claim that you've exercised your discretion wisely. They don't have to do it, but if they don't do it, then we're stuck with two doctors who saw the man, an insurance company and in-house people who didn't see the man. Then that's the struggle in these cases. I do understand that. Well, not necessarily. Insurance companies quite commonly get IMEs done by practicing physicians, and the way it works is the claimant has to go to the office of the doctor that the insurance company is paying, and that doctor looks them over. Now, sometimes it's devastating for the defense because the insurance company's doctor says, whoa, this guy's in really bad shape. And sometimes it's very helpful to the defense. Either way, you've got an actual examining physician. I understand that. The Ninth Circuit has not said, Your Honor, that we have to go out and get one of these, I guess, a tiebreaker examination. I'm not asking you whether you have to. You don't have to, under controlling existing Ninth Circuit authority, give the plaintiff copies of reports you've relied on, and you don't have to get an IME. But nevertheless, considering that there is some conflict of interest, why shouldn't the exercise of discretion be viewed more skeptically on account of the absence? The district court actually did temper this discretion by saying that there was no notification of some objective test. But if you take a step back. Is there any objective test now? The last time I looked, there wasn't, but maybe the literature has changed. Is there any objective test in the medical literature to rule in or out chronic fatigue syndrome? No, Your Honor, because it's a subjective claim. What you have to look at, then, is the totality. You look at what he has said himself. You look at the tests that he has gone through. You look at what he was telling his mental health professionals, who said, yes, he's fatigued, but they didn't find disability due to fatigue. They found that he was looking to change jobs. They found that this is someone who had negative assumptions about his work. They found that he was alert. He had no memory problems. He had no speech issues. He had insight. He had judgment. Then you support that at the tail end with the neuropsychological testing, which supports all of this objective identification, these doctors, that he was alert. He had judgment. And the fact that he had these motor skills, which did not demonstrate deficit. He had this attention and the concentration test, which he passed. That's not pointed out by Mr. Saloma in his briefing. All of these things, coupling that. Before you run out of time, I know Judge Hall had a question, and she never got to ask it. That's the way to say that. Was it covered now? Yes. Thanks. I think by the time it's just one last thing, though. Coupled all of that with the inconsistencies demonstrated. It's not a situation in which the company said yes, because you can go out of your house or you can drive a car. That does not mean you don't have CFS. It's the inconsistencies, what you must examine when someone has a subjective claim. And in an abuse of discretion standard, that's what's permitted. Thank you, Your Honor. Thank you, Your Honor. Your Honor's asked about the Eighth Circuit case, if there's anything like it in the Ninth Circuit case. In the Ninth Circuit, the Eighth Circuit case is Abram v. Cargill. In the Ninth Circuit, in Frederick v. Intel, I cite this in my brief, and, quote, I hope it's not too much out of context, but it says, Before denial of the appeal, Intel failed to notify Frederick that it had received medical reports that could be made available for review and comment by Frederick. And because of this, this Court said that the defendant forfeited its right to have discretionary review. So that's some of it. So you're saying to the extent there's Ninth Circuit authority, it goes to the Eighth and not the Tenth and Eleventh. Right. Also, with regard to the surveillance, the surveillance took place over several days. And as I recall, the surveillance filmed, they lasted, I think, maybe a half hour, the whole thing. So they've been watching them for days, and they caught them doing, you know, 15 minutes of this and 15 minutes of that over several days. How many days was it? I don't remember. As I recall, I think it was around a week. I thought it was four days. Well, maybe four days. I don't remember. It was over several days, but they got maybe a half hour worth of film out of it. I was looking at it because I was, I'd really like to watch it, but it looked like it was too long. Do I have to watch four days of film? No. No. I don't know what happened to the other three and a half days. I think they were looking at a closed door because he didn't go out. Probably. Yeah. Which leads me to something else. Now, have you watched the films? Can you tell me what they look like, what they show? They show him mowing his lawn. He's not pushing a mower. He's riding on this cart. Oh, it's a riding lawnmower? Yeah. And I don't remember him taking the kids to school or anything. I think that's in his diary. What about the ladder and the roof thing? He's got an aluminum ladder that he moves from one window, climbs up, and it clocks one window, and his wife's holding the ladder, and then he moves over to the next window, and he climbs up, and he clocks the next window, and I think that's it. That's it. On the riding lawnmower, my lawnmower, I have to pull a rope a bunch of times to get it going, choke it, pull the rope. I've never had a riding mower. What does he have to do to operate his riding mower? I don't recall him doing anything other than sitting on it and just riding around. I mean, do you turn a key to start it, or do you have to do all that business with pushing the choke and pulling the rope? I'm sure if he'd had to pull the choke, they'd have filmed it. I don't remember him pulling the choke. You watched it? Did I watch it? Yeah, yeah. Also, this film was taken a year after the denial. Oh, are you saying he got better in the year, or does that matter? Well, it matters in that he may have gotten better or he may not have gotten better. I'm just asking you about the juicy stuff on the film. I hear a guy's mowing his lawn. It sounds like maybe he's not in such bad shape after all. And you said two things about that. Number one, it's a riding mower, and number two, it's a year later. And I'm trying to decide which one matters. I don't think the film matters at all. And those are two good reasons why the film doesn't matter. Let me ask you kind of an overarching question. This is a big problem in chronic fatigue syndrome cases. Obviously, if there's a disability plan, there's secondary gain in every case. There are a certain number of people who just assume they retire early. How do you tell a true from a false claim of chronic fatigue syndrome? Maybe you send them out for an independent medical examination. Well, since there are no objectives, how do I know? Well, to some extent, doctors diagnose as the patient walks in the examining room or as they walk in the examining room and look at them. But to some extent, they diagnose by what the patient says. And the problem with chronic fatigue syndrome has been how do you deal with the problem of a good liar? Well, hopefully the doctor has more medical information and has more expertise in the illness that the man is faking. Well, the doctor would dearly love to get a blood test or an MRI or an X-ray or something that would say yes or no for him. But he can't, right? Yes, but Dr. Nadelson has been doing some work apparently in blood pressure, and he's found that people with chronic fatigue syndrome oftentimes have this blood pressure condition known as POTS, which, by the way, Mr. Saloma has. But there's no definite connection between the two, that the blood pressure condition and chronic fatigue syndrome go together. Your doctors were two experts in the field, right? Right. So, I mean, I suppose that even experts couldn't rule out a malingerer to a metaphysical certainty, but you would expect two leading experts to be more likely to catch a faker than somebody who doesn't see this kind of disease too often. Yes, and then also it would be hard for a faker who doesn't actually experience the symptoms to fake the symptoms to an expert. Why is that? Well, because he wouldn't know exactly what to fake. I mean, he'd never experienced it. He could read about it, but he may not, you know, he wouldn't know. You know, he'd slip up somewhere, you would expect. Let me ask you a question. If a guy can caulk a window, why can't he work? Well, he caulks a window for 15 minutes. He has to work for eight hours a day, and the test is can he perform his own occupation? Not can he do work, but can he perform his own occupation? And as for the neuropsychological testing that he went through, the finding of that testing was sure he was averaging a lot of things, there was nothing wrong with him, but in the end, if you look at ER 55, the conclusion was he could not do his particular job, which was high pressure, which was very cerebral, for Honda. So the test is very relevant. And most of the defense doctors seem to have ignored the test. The first doctor, Dr. Manolakis, said that he doesn't believe that the man is limited to 30 minutes a day of work. Well, that's fine, but that leaves another seven and a half hours. Can he do eight hours a day of work? If I understand correctly, the video shows him doing these activities and then going inside, and that's the last we see him until the next time he emerges from the house. Well, I don't remember if he went inside the house and then came out. Well, it's two different time periods, so I don't know if it shows him coming out of the house or going in. It just sort of shows him out there on the lawnmower and out there with the ladder. SSI gave him total disability, as I recall, and that does mean any work. What persuaded them to give him total disability? What did they say? I don't know. I don't know. I know that he... You mentioned disability. There's the mental disability and the physical. In this case, are we talking only about mental disability, but also physical disability? There was physical, the fatigue. It's not a mental condition at all, CFS, what he's got. Can't you test for physical disability? Like a functional capacity evaluation? Pardon me? Like a functional capacity evaluation? Yeah. Those are very controversial. I have a case right now, Saffron v. Wells Fargo, where the case was remanded back to the trial court to see if they're efficacious, and there's tons of evidence from various medical journals saying that those tests are... First of all, you have to have the right protocol. You have to have the right guy doing the test, and even then, it's very iffy. It doesn't test fatigue. It only tests your... Controversial or not, did they ever ask him to take one of these? Never. And you don't know what the Social Security determination letters said was the basis for... Did they grant it at the first level, or was there an appeal, or what? I don't know. I don't remember. It's in the record, though. As I remember, that's not collateral estoppel, but it's evidence for the administrator to consider. Is that right? Glenn v. Metlife says it's evidence of bias to not consider it, going to lower... I don't remember what it said. No, the test, no. I mean, the Social Security ruling, other than he got the Social Security, no, I don't. It's in the administrative record. I'd kind of like to know where. Do you remember the page? Yeah. The administrative record is 96, and I don't know what it is. Okay, I'll look. I may have it here. I'll look. It's 27. Administrative record, 27. Thank you. And the following. Thank you, counsel. And Soloma v. Honda Disability Plan is submitted. Thank you. And we are, let's see, Share v. Fleet Boston is submitted. Smith v. T-Mobile is submitted, and we are adjourned for the morning. All rise. All those having had business before this court in the U.S. Court of Appeals for the 9th Circuit shall now depart for this court stands adjourned.
judges: Hall, Kleinfeld, Silverman